IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

CHRISTOPHER JOHN MAYNE,

        Defendant.

No. CR13-1017

REPORT AND RECOMMENDATION

---

**TABLE OF CONTENTS**

I.    **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   **PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.  **RELEVANT FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    *A.*   *December 4, 2012* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        *1.*   *Fire scene* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
        *2.*   *Search warrant* . . . . . . . . . . . . . . . . . . . . . . . . . 5
    *B.*   *December 10, 2012* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    *C.*   *December 19, 2012* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *1.*   *Fire scene* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        *2.*   *Search warrant* . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV.   *DISCUSSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    *A.*   *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
    *B.*   *December 4, 2012* . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        *1.*   *Firefighters* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        *2.*   *Fire Marshal McMahon* . . . . . . . . . . . . . . . . . . . 16
        *3.*   *Lieutenant Haupert's first entry* . . . . . . . . . . . . . 16
        *4.*   *Lieutenant Haupert's second entry* . . . . . . . . . . . 18
    *C.*   *December 10, 2012* . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    *D.*   *December 19, 2012* . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        *1.*   *Consent* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
        *2.*   *Search warrant* . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.   *RECOMMENDATION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# I. INTRODUCTION

On the 6th day of November 2013, this matter came on for hearing on the Motion to Suppress (docket number 21) filed by the Defendant on October 28, 2013. The Government was represented by Special Assistant United States Attorney Lisa C. Williams. Defendant Christopher John Mayne appeared in person and was represented by his attorney, John J. Bishop.

## II. PROCEDURAL HISTORY

On September 27, 2013, Defendant Christopher John Mayne was charged by Indictment with attempted manufacture of methamphetamine (Count 1) and possession of pseudoephedrine to manufacture methamphetamine (Count 2). At the arraignment on September 30, 2013, Defendant entered a plea of not guilty and trial was set for December 2, 2013.

On October 28, 2013, Defendant timely filed the instant motion to suppress. The Government filed its resistance on November 4, 2013. Due to the pendency of the motion to suppress, the trial was continued to January 13, 2014.

## III. RELEVANT FACTS

### A. December 4, 2012

#### 1. Fire scene

At 3:35 a.m. on December 4, 2012, the Dubuque Fire Department responded to a house fire on Garfield Avenue in Dubuque. At some point, Assistant Fire Marshal Michael McMahon was called by firefighters on the scene and notified of the fire. After obtaining a city vehicle, McMahon responded to the scene.[1] By the time he arrived the fire was mostly "knocked down," but there was still a lot of smoke coming from the

---

[1] As one of his duties as assistant fire marshal, McMahon investigates the cause and origin of major fires, or fires with a suspicious origin.

house.[2]  McMahon was advised that the "owners" of the house could be located a couple of houses down, so McMahon went to talk to the owners.[3]

Marshal McMahon found Defendant, his girlfriend, and a couple of children at a nearby residence.  Defendant told McMahon that he had fallen asleep in the basement while sitting on the couch.  Defendant reported that his feet were outstretched in front of him, and he was slumped back on the couch.  According to Defendant, he was awakened by a feeling of heat on his feet and legs, and woke up to the fire in front of him.  Defendant apparently suffered burns as a result of the fire, and took a shower at the neighbor's house because he "felt like his skin was still on fire."  Defendant's girlfriend told McMahon that she had been sleeping and woke up when she heard "pounding" on the basement door.

After speaking with Defendant and his girlfriend, Marshal McMahon returned to the scene.  At that time, the fire was mostly out, but there were still some "hot spots."  Firefighters at the scene told McMahon that there was a plastic or glass tube that had a blue straw coming out of it at the bottom of the basement stairs.  Also, there was a pop bottle that appeared to contain salt or some white substance.  McMahon then entered the house to begin his "cause and origin" investigation.

Marshal McMahon entered through a side door, depicted on Government's Exhibit 4, p.2.  Immediately to the right after entering the door are steps leading to the basement.  The basement had an "old cellar-type door," which was open when McMahon entered.  A photograph depicting the basement steps and door was introduced as Government's Exhibit 4, p.3.  According to McMahon, firefighters had to open the door to attack part

---

[2] Government's Exhibit 1, p.1, is a photograph depicting the condition of the house when Marshal McMahon arrived.

[3] Defendant Christopher John Mayne was living at the residence at the time of the fire, together with his girlfriend, Tiffany Marie Leppert.  Defendant was an owner of the house, but it is unclear to the Court whether Leppert also had an ownership interest.

of the fire down in the basement. From the photograph, it appears that two garbage bags can be seen at the bottom of the steps. McMahon proceeded down the steps and onto the concrete floor of the basement, where he noted that the water was still approximately eight inches deep. From that vantage point, McMahon observed several items which were consistent with the manufacture of methamphetamine. Specifically, McMahon observed a pop bottle with a plastic tube, and two garbage bags which had been partially melted open, revealing multiple Morton iodine salt containers, more bottles with tubes extending from their lids, and a brown plastic bottle which McMahon believed contained hydrogen peroxide. (These items are depicted in Government's Exhibit 4, pp.4, 5, and 6). McMahon could also see a can of Coleman fuel and an instant ice pack nearby. (These items are depicted in Government's Exhibit 4, pp.7 and 8.) Based on his training, McMahon knew that these items are consistent with the manufacture of methamphetamine.

After viewing the items in the basement, Marshal McMahon contacted the Dubuque Police Department. Lieutenant Dave Haupert testified that he received a call from Captain Lemke, the patrol shift commander, at about 5:00 a.m. Lemke told Haupert that there was an active structure fire at a residence on Garfield, and advised him further that the tenant or owner was Christopher Mayne. Both Lemke and Haupert recognized Defendant's name as someone who was involved with methamphetamine. Lemke told Haupert that McMahon had requested that Haupert call him.[4] Haupert called McMahon a short time later, but McMahon said he was interviewing Mayne at the time, and would call back later.[5] McMahon returned Haupert's call at approximately 6:00 a.m., but said that the fire crews were still working and "we don't need you here right now."

---

[4] Lieutenant Haupert is a member of the Dubuque Drug Task Force. Marshal McMahon testified that Haupert is one of the officers who McMahon contacts when he believes a fire may be drug related.

[5] The Court notes that this suggests McMahon placed his initial call to the police before he went to meet with Defendant and before he entered the home.

At 8:47 a.m., Marshal McMahon called Lieutenant Haupert again and advised him that "we found some things in here that might be interesting to you." Specifically, McMahon mentioned the Coleman camping fuel, a cold pack, and a pop bottle with a hose coming out of it. Haupert proceeded to the scene, arriving at approximately 9:30 a.m.

When Lieutenant Haupert arrived on the scene, he was briefed outside the house by Marshal McMahon. Haupert and McMahon then entered the residence, and proceeded to the bottom of the basement steps. Haupert did not proceed further than the bottom of the steps. Haupert observed a pop bottle floating in the water, the cold pack, and a burned up Coleman can. Haupert could also see a couple of partially melted garbage bags, with items associated with the manufacture of methamphetamine inside. Specifically, Haupert saw coffee filters, a pop bottle with a hose coming out, and a brown bottle which looked like it had held hydrogen peroxide or tincture of iodine. Haupert then left the residence to seek a search warrant.

### 2. *Search warrant*

Lieutenant Haupert submitted his search warrant application to a state judicial officer.[6] After reciting certain standard language regarding drug dealers/manufacturers, Haupert advised the judicial officer of the following:

- At approximately 3:35 a.m. on that date, the Dubuque Police Department and Fire Department were dispatched to the residence of Christopher Mayne and Tiffany Leppert for a reported structure fire. Upon arrival, the residence was found to be fully engulfed.

- Assistant Fire Chief/Fire Marshal McMahon interviewed Mayne. Mayne told McMahon that he had been in the basement with another subject, identified as Jacob Laufenberg.

---

[6] The signature of the judge or magistrate is illegible, and the judicial officer signing the warrant is not otherwise identified.

- Mayne told McMahon that he was asleep and felt heat on his legs and awoke to a fire. Mayne said that he attempted to put the fire out but could not, so he left the residence and went to two separate neighbors' residences to attempt to locate a fire extinguisher. Mayne did not attempt to call 911, and the fire was reported by a passerby.

- McMahon said that Leppert and three juvenile children were also in the home at the time of the fire.

- After the fire was extinguished, firefighters reported to McMahon that "they observed items in the basement that they knew through previous training by the Dubuque Drug Task Force (DDTF) to be commonly used during [the] manufacture [of] methamphetamine." Included in those items were Coleman camping fuel and an instant cold pack.

- Assistant Chief McMahon told Haupert that he had also observed these items at the bottom of the basement stairwell.

- After Haupert arrived at the scene, McMahon "guided" him to the area of the stairwell. Haupert then observed two one-gallon cans of Coleman camping fuel, an instant cold pack, and a garbage bag containing several pop bottles with tubing coming out of the top and a Morton salt container.

- While Mayne was at a neighbor's residence, he took a shower while being completely clothed.

- The items observed by firefighters, McMahon, and Haupert "are consistent with the manufacture of methamphetamine."

- "Mayne and Laufenberg are also known by the DDTF to be involved in the use and manufacture of methamphetamine."

The judicial officer concluded that probable cause was shown by the application and attachment, and a search warrant was issued at 10:53 a.m.

6

With the search warrant in hand, Lieutenant Haupert returned to the fire scene, arriving at about 11:00 a.m. Haupert testified that he and other officers "started removing everything that we knew was there, and to continue a search of the entire residence if necessary." According to Haupert, however, they were unable to complete the search on December 4 because "[i]t was determined by the fire department in a conversation with me that the instability of the structure made it too unsafe to proceed any further than basically the bottom of the stairs." Before fire officials left the scene, the house was boarded up to secure the property. *See* Government's Exhibit 5.

Government's Exhibit 1 consists of the application for search warrant and supporting attachment, the search warrant, and the "return of service." The return of service, signed by Lieutenant Haupert, states that he executed the search warrant on December 4, 2012. The return of service is subscribed and sworn to on that date before Ted J. McClimon, a notary public. According to a notation on the return of service, the search warrant was returned at 9:24 a.m. on December 5. The return of service refers to a "complete inventory of the property seized" and states that it is attached to the return. The attachment is not included in Government's Exhibit 1, but is apparently the first three pages of Government's Exhibit 3. The inventory lists 65 items, virtually all of which are consistent with the manufacture of methamphetamine. The items were found at the bottom of the basement stairs, mostly in three garbage bags.

### B. December 10, 2012

Lieutenant Haupert and Marshal McMahon returned to the scene on December 10 to continue their investigation. Also attending at that time was another Dubuque fire marshal (Mark Ludescher) and a private fire investigator (Lonn Abeltins) hired by Defendant's insurance company. Defendant had been informed by McMahon and/or Abeltins that they would be entering the building at that time, and Defendant and Leppert attended as well. Other fire department personnel were also present to remove the boards which had been used to secure the building.

Lieutenant Haupert testified that before anyone entered the residence, he spoke with Defendant outside. Haupert told Defendant that he wanted to go back in and look around "to see if we could figure out what was going on." Although he could not recall his exact words, Haupert testified that he told Defendant they needed to go back in to continue the investigation and asked "are you okay with that?" According to Haupert, Mayne responded that "he was fine with it, sure, no problem." Marshal McMahon also testified that Defendant was "very cooperative" and did not have "any problem" with the investigators reentering the house on December 10.

The investigators then entered the house. Defendant and Leppert were permitted to enter the house to retrieve "a couple of totes," but they could not proceed very far because of the instability of the structure. According to Lieutenant Haupert, one had to come in the front door to get up to the second floor. At some point, Mr. Abeltins was down in the basement. He called Haupert down to look. While he was in the basement, Haupert saw a gas can (with an odor that was not consistent with gas, but was more consistent with Coleman camping fuel), another Coleman camping fuel can, and other items which Haupert had seen from the basement steps on December 4. The investigators decided, however, that it was too dangerous to proceed further into the basement because they were fearful of the structure collapsing. Accordingly, it was decided by Abeltins that they would leave and "come back again for a complete demolition." No items were seized on December 10, and the house was boarded back up.

### C. December 19, 2012

#### 1. Fire scene

The investigators returned to the scene on December 19, accompanied by a construction crew. It had been decided that the building would be deconstructed from the top down, in order to allow a thorough search of the residence. At some point, Lieutenant Haupert, Marshal McMahon, Marshal Ludescher, and Mr. Abeltins entered the basement. The investigators found the items which they had seen on December 4 and December 10,

and started removing the items in tubs. Some of the items removed were "newly discovered."

At some point after the search had begun, Defendant arrived at the residence. Lieutenant Haupert was in the basement at that time, but went outside to speak with Defendant after being notified he was there. Haupert advised Defendant that they were finding items consistent with the manufacture of methamphetamine and asked Defendant "do you want to tell me about it; what's going on?". According to Haupert, Defendant "denied everything" and "became pretty evasive." Haupert then asked Defendant "do you mind if I go back in and keep looking around and figure out what's going on here?". Defendant refused to give his consent. Haupert then went back in and told McMahon and Abeltins to "stop what we're doing," so he could seek a search warrant.

### 2.    *Search warrant*

Lieutenant Haupert then sought a second search warrant. The first two pages of Haupert's attachment to the search warrant application appear to be identical to the first two pages submitted in support of the December 4 search warrant. A third page to the attachment advised the judicial officer of the following:

- A previous search warrant was granted for the residence on December 4, 2012.

- The search warrant was executed and "several additional items other than that described above were located indicating the manufacture of methamphetamine."

- "The search was not completed due to the severe damage and structural integrity of the building. The area where the fire was believed to have started in the basement was not accessible."

- Haupert met with McMahon, Ludescher, and an insurance investigator on December 10 and it was determined that on December 19 the insurance company would "disassemble the structure in an attempt to gain access into

9

the unstable portions of the residence and to the point of origin in the basement."

- While at the scene on December 10, Mayne and Leppert were present and gave verbal permission for Haupert and the other investigators to enter the structure. While inside, Haupert observed in plain view items that were not visible during the initial search due to the water level in the basement, including a can of Coleman camping fuel and an HCL generator.

- On December 19, Haupert returned to the residence with other investigators to retrieve the items located on December 10. Those items and additional items were located and removed from the residence.

- After removing those items, Haupert asked Mayne for permission to reenter the structure to continue the search. "Mayne was hesitant after he was advised of the previous items located."

The judicial officer concluded that probable cause was shown by the application and attachment, and a search warrant was issued at 11:30 a.m. Haupert then returned to the scene and investigators completed the search.

Two inventories were prepared as a result of the search on December 19. Investigators seized 51 items *before* the search warrant was obtained on December 19, and seized an additional 14 items *after* the issuance of the search warrant. *See* Government's Exhibit 3, pp.5-6 and 4, respectively.

## IV. DISCUSSION

In his motion to suppress, Defendant alleges generally that "[l]aw enforcement's actions violated the defendant's 4th Amendment rights to be free from unreasonable search and seizure." In his two-page brief, Defendant cites one case and argues that "when the searches in question were conducted, there existed no exigent circumstances or any other exception to the warrant requirement to justify a warrantless search of the fire-damaged

residence." The Court is largely left to speculate regarding the specifics of Defendant's argument.

## A. *Applicable Law*

Before discussing the various entries into Defendant's burned-out house, I start the discussion with a review of *Michigan v. Tyler*, 436 U.S. 499 (1978) — the sole case cited by Defendant in his brief. In *Tyler*, the fire department responded to the scene of a fire in a furniture store. When the fire chief arrived on the scene at around 2:00 a.m., the fire department was "just watering down smoldering embers." *Id.* at 501. One of the firefighters on the scene informed the chief that two plastic containers of flammable liquid had been found in the building. Using portable lights, the chief entered the gutted store, which was filled with smoke and steam, to examine the containers. *Id.* at 502. Believing the fire could have been caused by arson, the chief called a police detective, who arrived at around 3:30 a.m. The police detective "took several pictures of the containers and of the interior of the store, but finally abandoned his efforts because of the smoke and steam." *Id.* The firefighters departed the scene by 4:00 a.m., and the two containers were taken to the fire department, where they were turned over to the police detective for safekeeping. "There was neither consent nor a warrant for any of these entries into the building, nor for the removal of the containers." *Id.*

Four hours later, the chief returned to the scene with an assistant chief, whose job was to determine the origin of all fires that occurred within the township. After a cursory examination, they left. The assistant chief returned one hour later, however, with the police detective. After reentering the building, the investigators saw suspicious burn marks in the carpet. After leaving the building to obtain tools, they returned to the building and removed pieces of the carpet and sections of the stairs "to preserve these bits of evidence suggestive of a fuse trail." *Id.* Again, there was neither consent nor a warrant for these entries and seizures.

Twenty-six days later, an investigator with the state police returned to the building to take photographs. Over the course of several visits, the state investigator "secured physical evidence and formed opinions that played a substantial role at trial in establishing arson as a cause of the fire and in refuting the respondents' testimony about what furniture had been lost." *Id.* at 503. The entries into the building were without warrants or the owner's consent, and were for the sole purpose "of making an investigation and seizing evidence." *Id.*

The *Tyler* Court began its discussion by noting that "the Fourth Amendment extends beyond the paradigmatic entry into a private dwelling by a law enforcement officer in search of the fruits or instrumentalities of a crime." *Id.* at 504. Entries into private property by government officials, including fire inspectors, fall within the protection of the Fourth Amendment.

> [T]here is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime, or because the fire might have been started deliberately. Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment.

*Tyler*, 436 U.S. at 506.

The Court further noted, however, that its decisions have recognized that a warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant. *Id.* at 509. For obvious reasons, a "compelling need for official action" includes fighting a fire.

> A burning building clearly presents an exigency of sufficient proportions to render a warrantless entry "reasonable." Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze. And once in a building for this purpose,

firefighters may seize evidence of arson that is in plain view. (citation omitted) Thus, the Fourth and Fourteenth Amendments were not violated by the entry of the firemen to extinguish the fire at Tyler's Auction, nor by Chief See's removal of the two plastic containers of flammable liquid found on the floor of one of the showrooms.

*Tyler*, 436 U.S. at 509.

The Court further concluded that the exigency justifying a warrantless entry to fight a fire does not end with "the dousing of the last flame." *Id.* at 510. Because an immediate investigation may be necessary to preserve evidence from intentional or accidental destruction, "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished." *Id.*

The *Tyler* Court concluded that a warrant was not necessary for the "early morning re-entries" on the day of the fire.[7] Entries occurring after that day, however, "were clearly detached from the initial exigency and warrantless entry." *Id.* at 511. Because the entries conducted *after* the day of the fire were without valid warrants and without consent, they were unlawful under the Fourth and Fourteenth Amendments.

Six years later, the Court addressed a similar issue in *Michigan v. Clifford*, 464 U.S. 287 (1984).[8] In *Clifford*, fire units were called to the scene of a home fire at about 5:42 a.m. The fire was extinguished and all fire officials and police left the premises at 7:04 a.m. At 8:00 a.m., a fire investigator was informed that the fire department suspected arson, and was instructed to investigate the fire. The fire investigator and his

---

[7] In his dissent, Justice White noted that the Michigan Supreme Court found that the warrantless searches at 8 and 9 a.m. were not, in fact, continuations of the earlier entry under exigent circumstances. Justice White opined that "[t]he Court offers no sound basis for overturning this conclusion of the state court that the subsequent re-entries were distinct from the original entry." *Id.* at 515.

[8] The *Clifford* Court stated that "[w]e granted certiorari to clarify doubt that appears to exist as to the application of our decision in *Tyler*." 464 U.S. at 289.

partner arrived at the scene at about 1:00 p.m. When they arrived on the scene, investigators found a work crew boarding up the house and pumping water out of the basement. They found a Coleman fuel can in the driveway, which was seized as evidence. The can had been found in the basement by firefighters and was removed and placed by the side door, where the investigator discovered it on his arrival.

At 1:30 p.m., the investigators, without obtaining consent or an administrative warrant, entered the house and began their investigation into the cause of the fire. Investigators quickly determined that the fire had originated beneath the basement stairway, where they found two more Coleman fuel cans and "a crock pot with attached wires leading to an electrical timer that was plugged into an outlet a few feet away." *Id.* at 290-91. All of the evidence was seized. The investigators then searched the remainder of the house.

The Court began its discussion by reviewing its holding in *Tyler*. The Court repeated that a burning building creates an exigency that justifies a warrantless entry by fire officials to fight the blaze. The Court also affirmed that "officials need no warrant to *remain* for 'a reasonable time to investigate the cause of the blaze after it has been extinguished.'" *Id.* at 293 (quoting *Tyler*, 436 U.S. at 510) (emphasis in original). However, the *Clifford* Court found that, unlike the circumstances in *Tyler*, "the challenged search was not a continuation of an earlier search." *Id.* at 296. Furthermore, by boarding up the house prior to the investigators' arrival, "the Cliffords had taken steps to secure the privacy interests that remained in their residence against further intrusion." *Id.* Accordingly, the Court concluded that the evidence seized inside the house was the product of an unconstitutional post-fire search and must be excluded.

> At least where a homeowner has made a reasonable effort to secure his fire-damaged home after the blaze has been extinguished and the fire and police units have left the scene, we hold that a subsequent postfire search must be conducted

> pursuant to a warrant, consent, or the identification of some
> new exigency.

*Clifford*, 464 U.S. at 296.

With these general principles in mind, I now turn to the entries made by fire and police officials into Defendant's home.

### B.  December 4, 2012

Defendant asserts generally that when the "searches in question" were conducted, "law enforcement" violated his Fourth Amendment rights.  Accordingly, the Court must speculate regarding which "searches" Defendant contends are unconstitutional, and the basis for his argument.  By the Court's count, there were four "entries" into Defendant's house by government representatives on December 4.  First, firefighters entered the house for the purpose of extinguishing the fire.  Second, Fire Marshal McMahon entered the house to begin a cause and origin investigation.  Third, Lieutenant Haupert entered the house with McMahon to view certain items found by McMahon near the bottom of the basement stairs.  Fourth, Haupert reentered the residence after obtaining a search warrant. I will address each entry in turn.

### 1.  Firefighters

The Fourth Amendment, as applied to the states under the Fourteenth Amendment, protects persons against unreasonable searches and seizures of their persons, houses, papers, and effects.  A warrantless entry to a home is presumptively unreasonable. *Michigan v. Fisher*, 558 U.S. 45, 47 (2009).  An exception to the warrant requirement exists, however, when there are exigent circumstances.  *Tyler*, 436 U.S. at 509 ("[A] warrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant.").  It is beyond dispute that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.'"  *Id.*  Accordingly, the firefighters' entry into

Defendant's home was not violative of the Fourth Amendment, and they may testify regarding their observations of incriminating evidence.

### 2. Fire Marshal McMahon

Fire Marshal McMahon entered the residence to begin his cause and origin investigation while firefighters were still at the scene and putting out "hot spots." After entering the side door, McMahon proceeded to the basement, where he observed numerous items consistent with the manufacture of methamphetamine. McMahon documented the scene with photographs. McMahon's actions are indistinguishable from those of the fire chief in *Tyler*. McMahon did not need a warrant to enter the house to conduct an investigation. *Id.* at 510 ("officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished"). While McMahon did not seize any of the suspicious items, he was authorized to do so. *Id.* (holding that when a warrantless entry to determine the cause of a fire is constitutional, "the warrantless seizure of evidence while inspecting the premises for these purposes also is constitutional").

### 3. Lieutenant Haupert's first entry

While Marshal McMahon was continuing his investigation, he called Lieutenant Haupert to the scene. When Haupert arrived at approximately 9:30 a.m., McMahon briefed him outside and then escorted him to the bottom of the basement steps. After observing numerous items consistent with the manufacture of methamphetamine, Haupert left the residence to obtain a search warrant. I assume that it is Haupert's initial entry into the house that Defendant finds particularly objectionable.

I recognize that Fire Marshal McMahon and Lieutenant Haupert had different investigative roles. McMahon's principal interest was determining the "cause and origin" of the fire, without a particular interest in a criminal prosecution. While Haupert was presumably interested in the cause and origin of the fire, his focus was on whether a crime had been committed. In concluding that "officials" do not need a warrant to remain in a

building for a reasonable time to investigate the cause of a blaze, however, the *Tyler* Court did not draw any distinction between the two roles. *Id.* at 510. It should be noted that the facts in *Tyler* are almost identical to those found here. The fire chief, whose responsibilities included determining the cause of a fire, was informed by a firefighter that incriminating evidence of arson had been found in the building. The fire chief then called a police detective to assist in the investigation. The detective entered the store and took several pictures, but abandoned his efforts because of smoke and steam. After the fire had been extinguished and the firefighters departed, the fire chief and detective seized two plastic containers of flammable liquid, which were kept by the detective for safekeeping. *Five hours later*, the detective returned to the scene with an assistant fire chief and again entered the building — without a warrant — and seized additional incriminating evidence. *Id.* at 502. The Supreme Court found no Fourth Amendment violation.

Turning to the facts in the instant action, Marshal McMahon gave police officials an early "heads-up" when he was advised by firefighters that suspicious items were observed in the basement. After conducting a more thorough investigation, McMahon called Lieutenant Haupert to the scene, advising him that "we found some things in here that might be interesting to you." McMahon had remained on the scene, and had not completed his investigation, when Haupert arrived. Haupert proceeded only to the bottom of the basement steps before retreating and seeking a search warrant. Haupert did not seize any evidence during his initial entry. If the police detective in *Tyler* did not violate the Fourth Amendment by viewing the interior of the structure and then returning five hours later, *without a warrant*, to conduct a further investigation and seize evidence, then it is difficult to see how Haupert's initial look-see could be considered violative of the Fourth Amendment.

The facts in *Clifford* — where the Court concluded that the evidence was the product of an unconstitutional post-fire search and, therefore, must be excluded — are distinguishable from those presented here. In *Clifford*, all police and fire personnel left

the premises at approximately 7:00 a.m. Five hours later, investigators returned to the scene and found a work crew boarding up the house. Nonetheless, the investigators entered the house, without a warrant, and seized incriminating evidence. In the instant action, however, Marshal McMahon had remained on the scene and his investigation was ongoing. Lieutenant Haupert entered the house as part of the initial investigation, but did not seize any evidence until after obtaining a search warrant.

In *United States v. Boettger*, 71 F.3d 1410, 1414 (8th Cir. 1995), the Court recognized that *Tyler* and *Clifford* did not establish any "bright line test." Instead, in determining the reasonableness of a search, the Court must consider the circumstances of the particular case. "Important considerations are the existence of legitimate privacy interests, exigent circumstances, and whether the object of the search is to determine the cause of the fire or to gather evidence of criminal activity." *Id.* Here, the fire had only recently been extinguished. (It is unclear to the Court whether firefighters remained on the scene when Lieutenant Haupert arrived at about 9:30 a.m.) Defendant had not taken any action to secure the property or otherwise assert his privacy interests. Furthermore, while investigators may have suspected illegal activity, the principal focus of the investigation at that time was to determine the cause and origin of the fire. After considering all of the circumstances, I conclude that Haupert's initial entry into the house was not violative of the Fourth Amendment.

### 4. Lieutenant Haupert's second entry

When Lieutenant Haupert returned to the scene at about 11:00 a.m. and reentered the structure, he was armed with a search warrant. Defendant does not argue that the search warrant was not supported by probable cause, nor could he. The search warrant application described the suspicious items observed by firefighters, Marshal McMahon, and Lieutenant Haupert. As set forth above, the observations were made at places where the observer had a right to be. The judicial officer was told that the items were consistent with the manufacture of methamphetamine. Probable cause clearly existed for the issuance

of a search warrant. The items seized pursuant to the search warrant are, therefore, admissible.

In summary, the firefighters' initial entry into the house was supported by exigent circumstances. Because "officials need no warrant to remain in a building for a reasonable time to investigate the cause of a blaze after it has been extinguished," the entry by Marshal McMahon and Lieutenant Haupert did not violate the Fourth Amendment. *Tyler*, 436 U.S. at 510. Haupert's subsequent search of the residence, and seizure of incriminating evidence, was conducted pursuant to a duly authorized search warrant. I can find no violation of the Fourth Amendment on December 4.

### C. December 10, 2012

Fire Marshal McMahon and Lieutenant Haupert returned to the scene on December 10. They were accompanied by Fire Marshal Mark Ludescher and Lonn Abeltins, a private fire investigator hired by Defendant's insurance company. Defendant had been informed that investigators would be returning to the house, and he and his girlfriend also appeared at that time. Before entering the residence, Haupert spoke with Defendant outside. Both Haupert and McMahon credibly testified that Defendant consented to the investigators entering the house.

While the Fourth Amendment generally prohibits the warrantless entry of a person's house, voluntary consent from the individual whose property is to be searched is a recognized exception. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). The evidence presented at the hearing supports a finding that Defendant consented to a search of his residence on December 10. There is no evidence to suggest that the consent was not voluntary. Defendant is an adult with apparently average intelligence, he has had prior dealings with law enforcement, he did not appear to be under the influence of any drugs or alcohol, and was not subjected to any coercive tactics in order to force his consent.

During the course of the search, Mr. Abeltins called Lieutenant Haupert to the basement, where they saw additional items consistent with the manufacture of

methamphetamine. The investigators were fearful, however, that the structure may collapse and decided to complete their search at a later date, in conjunction with the demolition of the house. No items were seized on December 10. Because entry into the house was pursuant to Defendant's voluntary consent, however, investigators may testify regarding their observations on that date.

### D.  December 19, 2012

Nine days later, on December 19, investigators returned to the scene. They resumed their search in conjunction with the demolition of the building. There were no exigent circumstances at that time, but the Government argues that investigators had consent to enter the premises (given by Defendant on December 10) and a valid search warrant (issued on December 4). When Defendant arrived at the scene during the course of the search, he refused Lieutenant Haupert's request for consent to continue the search. Haupert then suspended the search while he obtained a new search warrant.

### 1.    Consent

As set forth above, Defendant consented to investigators entering the house on December 10. The Government argues that because Defendant had not indicated his consent to search was being withdrawn, the investigators' warrantless entry into the house nine days later was lawful. I find the argument unpersuasive. Just because Defendant agreed to investigators entering the house on December 10 does not mean that he agreed to their entry whenever they saw fit.

"The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). *See also United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005). Lieutenant Haupert testified that when the parties met at the house on December 10, he asked Defendant if they could go back in and look around "to see if we could figure out what was going on." After viewing the interior for a short time, however,

the investigators decided it was too dangerous to proceed further. There is no evidence that Haupert asked Defendant if it was okay to return and continue the search on a later date. I do not believe that a "typical reasonable person" would have understood the exchange between Haupert and Defendant to authorize entry by investigators on a future date or dates, whenever they decided to do so. That is, I believe that any entry after December 10 was outside the scope of the consent given by Defendant on that date.

In support of its argument, the Government cites *United States v. Parker*, 412 F.3d 1000, 1002 (8th Cir. 2005) ("A defendant must make an unequivocal act or statement to indicate that consent is being withdrawn."). In *Parker*, officers entered a mobile home, with the owner's consent, to look for a federal fugitive. Instead, they found a gun and the occupant was charged with being a felon in possession of a firearm. In a motion to suppress, the defendant claimed that although he initially gave his consent to officers to enter the trailer to look for the fugitive, he withdrew his consent before the officers found the guns. *Id.* at 1001. The Court rejected the defendant's argument, finding that there was no evidence of an unequivocal withdrawal of consent. I believe that *Parker* is distinguishable on its facts. The search in *Parker* was a continuous event. In the instant action, Defendant gave consent to enter his residence on December 10, and investigators acted on that consent. The search ended and was then resumed nine days later. In my view, a consent to search on one occasion does not constitute consent to search nine days later. Because Defendant never *gave* consent to search on future dates, he was not required to *withdraw* the purported consent.

The other two cases cited by the Government are similarly distinguishable. In *United States v. Reid*, 19 F. Supp. 2d 534 (E.D. Va. 1998), a vehicle was removed from a hotel parking lot and impounded. Two days later, the Government conducted an inventory search of the car. The Court concluded that consent given by the driver was sufficient to make the search valid. *Id.* at 539. In *United States v. Casares-Cardenas*, 14 F.3d 1283 (8th Cir. 1994), a consent search was conducted during a traffic stop, resulting

in the discovery of a kilogram of cocaine and some methamphetamine. The occupants were arrested and the vehicle was impounded. Two months later, authorities received a tip to the effect that the car contained yet more drugs. The officer searched the car again and found 174 grams of heroin in the air conditioning duct system. The defendant argued that the search of the vehicle exceeded the scope of the consent given by the driver. The Court concluded that the search conducted two months after the arrests (but while the automobile was still in the custody of the police) was not unreasonable within the meaning of the Fourth Amendment. *Id.* at 1287. In both cases, the vehicles remained in the custody of police between the time consent was given and the subsequent search. Here, the property to be searched was *not* in the custody of the police. Rather, Defendant retained full ownership of, and a privacy interest in, the burned-out house.

In summary, I believe Defendant's consent to enter the house on December 10 cannot be used as a basis for the investigators' warrantless entry on December 19. Giving consent to authorities to enter a house on one occasion does not authorize authorities to enter whenever they choose.

### 2. *Search warrant*

Alternatively, the Government argues that "when police returned to the residence on December 19, the original search warrant remained valid." On December 4, Lieutenant Haupert obtained a valid warrant to search Defendant's residence. Haupert executed the search warrant on the same day, and seized numerous items which are consistent with the manufacture of methamphetamine. On the following morning, Haupert returned the search warrant to the court, together with an inventory of the seized property.

In arguing that the December 4 search warrant "remained valid" on December 19, the Government cites cases discussing when a search warrant becomes stale. For example, in *United States v. Brewer*, 588 F.3d 1165 (8th Cir. 2009), authorities obtained warrants to conduct a forensic analysis of seized computer media. The defendant argued that the search warrants had expired when they were not executed within ten days, as required by

Missouri law.[9]  The Court concluded, however, that it need only consider whether the delay rendered the warrants stale, notwithstanding the failure to execute the warrant within ten days, as required by the state statute. *Id*. at 1172-73. The factors to be considered in determining whether probable cause had dissipated between the issuance of the warrant and its execution include "the lapse of time since the warrant was issued, the nature of the criminal activity, and the kind of property subject to the search." *Id*. at 1173 (quoting *United States v. Gibson*, 123 F.3d 1121, 1124 (8th Cir. 1997)).

In the cases cited by the Government, the issue was whether a *delay* in the *execution* of a search warrant rendered it invalid if probable cause continued to exist.  The Government argues that because the house was boarded up on December 4 following the initial search, probable cause continued to exist when the search was conducted on December 19.  In this case, however, Lieutenant Haupert did not delay in executing the search warrant issued on December 4.  That is, Haupert *executed* the warrant the same day and *returned* the warrant to the court the following day.  Accordingly, the question here may be stated as follows:  If a search warrant is executed and returned to the Court, may authorities rely on the warrant in a subsequent search if probable cause continues to exist?

The general rule is that a warrant authorizes only one search.  *United States v. Keszthelyi*, 308 F.3d 557, 568-69 (6th Cir. 2002).  However, most federal courts of appeals have recognized the "reasonable continuation rule." *Id*. at 568.  This rule permits a second entry if it is a reasonable continuation of the original search.

The Eighth Circuit Court of Appeals recognized the validity of multiple entries pursuant to a single warrant in *United States v. Carter*, 854 F.2d 1102 (8th Cir. 1977).  In *Carter*, investigators obtained a search warrant for a motel room.  After the initial search, the defendant told authorities that they had missed $4,000 hidden under the

---

[9] Similarly, Iowa law provides that "[a] search warrant shall be executed within ten days from its date; failure to execute within that period shall void the warrant." Iowa Code § 808.8.

23

mattress. Investigators then returned to the motel and recovered the money. The defendant challenged the return search. The Eighth Circuit stated that "the question is not whether there were two entries pursuant to the warrant, but rather, whether the second search was a continuation of the first." *Id.* at 1107. The Court concluded that the "authority of the warrant had not expired" and the second search, which took place several hours later, was not beyond the scope of the Fourth Amendment. *Id.*

In reaching its conclusion, the Eighth Circuit relied on *United States v. Bowling*, 351 F.2d 236, 241 (6th Cir. 1965). There, officers executed a warrant to search the defendant's home for stolen business machines. The police recorded serial numbers of the machines, left the house without seizing the items, and checked the serial numbers overnight. Upon discovering that the serial numbers matched those of the stolen goods, the police returned the next day and seized the machines. *Id.* at 240-41. The Sixth Circuit held that the second entry into the defendant's home was authorized by the original warrant. Similarly, in *United States v. Pape*, 917 F. Supp. 2d 888 (D. Minn. 2013), the Court found that a limited search conducted less than 12 hours after the initial search was authorized as a continuation of the first. The Court emphasized, however, that it "is by no means suggesting that law enforcement may freely enter, on numerous occasions, a location specified in a valid search warrant for the purpose of recovering additional evidence until the search warrant actually expires." *Id.* at 901.

In *Keszthelyi*, the Sixth Circuit cited *Bowling* and *Carter* for the proposition that "a single search warrant may authorize more than one entry into the premises identified in the warrant, as long as the second entry is a reasonable continuation of the original search." 308 F.3d at 568. There, police searched the defendant's home on one day and then returned the following day. The Court concluded that the second search was not a reasonable continuation of the search on the prior day and, therefore, a second warrant was required. While police may temporarily suspend the initial execution of a search warrant under certain circumstances and continue the search at another time, the law "does not

24

permit the police unlimited access to the premises identified in a warrant throughout the life of the warrant." *Id.* at 568-69.

> We note that a search conducted pursuant to a lawful warrant may last as long, and be as thorough, as reasonably necessary to fully execute the warrant. Thus, law enforcement agents generally may continue to search the premises described in the warrant until they are satisfied that all available evidence has been located. Once the execution of a warrant is complete, however, the authority conferred by the warrant terminates.

*Keszthelyi*, 308 F.2d at 571. (all citations omitted)

Turning to the facts in the instant action, it could be argued that investigators were unable to complete their search on December 4 due to the condition of the structure. That is, while investigators seized a substantial number of items which were consistent with the manufacture of methamphetamine, they were not able to venture far into the basement due to the potential for collapse. Unlike those cases where the reasonable continuation rule has been applied, however, Lieutenant Haupert returned the search warrant to the court, together with an inventory of items seized. The return of service states that the search warrant was executed on December 4 by making a search of the described premises. At no time did Haupert advise the court that the search was suspended for any reason or would be continued on a later date.

Here, the search warrant was issued and executed on December 4. The return of service was signed by Lieutenant Haupert on that date and returned to the court the following day. I conclude that the search conducted 15 days later, on December 19, was not merely a continuation of the first search. The cases cited by the Government, where the search warrant was not executed immediately after it was issued, are inapposite. Accordingly, I believe the search warrant issued on December 4 did not authorize the investigators' reentry into the house on December 19.

When investigators began their search of the house on December 19, there were no exigent circumstances, they did not have a valid search warrant, and Defendant had not

given his consent. Accordingly, the warrantless entry into Defendant's house on December 19 violated the Fourth Amendment. Items seized from the residence during authorities' initial search on December 19 are inadmissible. After Defendant appeared on the 19th and refused to give consent, however, Lieutenant Haupert obtained a second search warrant. The second warrant is supported by probable cause and, therefore, items seized after the search warrant was obtained on December 19 are admissible.

## V. RECOMMENDATION

For the reasons set forth above, I respectfully recommend that Defendant's Motion to Suppress (docket number 21) be **GRANTED in part** and **DENIED in part** as follows:

1. There was no Fourth Amendment violation on December 4, 2012 and, therefore, evidence obtained on that date is admissible.

2. Entry into Defendant's house on December 10 was pursuant to his consent and, therefore, evidence obtained on that date is admissible.

3. When investigators initially entered Defendant's house on December 19, there were no exigent circumstances, they did not have a valid search warrant, and Defendant had not given his consent. Accordingly, their initial entry on that date was violative of the Fourth Amendment and the evidence obtained at that time is inadmissible.

4. Partway through the search on December 19, investigators obtained a valid search warrant. Accordingly, evidence obtained on that date after the search warrant was issued is admissible.

The parties are advised, pursuant to 28 U.S.C. § 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to this Report*

*and Recommendation, they must promptly order a transcript of the hearing held on November 6, 2013.*

DATED this 15th day of November, 2013.

_____

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA